In the Matter of R. HOE & CO., INC., Debtor.

In proceedings for the Reorganization of a Corporation ABARTA CORP. (d/b/a Press Publishing Co.), Claimant-Appellant,

v.

James B. KILSHEIMER, III, and Robert M. Corrao, as Trustees, Appellees.

No. 121, Docket 74–1493.

United States Court of Appeals, Second Circuit.

Argued Nov. 15, 1974.

Decided Dec. 17, 1974.

Theodore Gewertz, New York City (Wachtell, Lipton, Rosen & Katz, Leonard M. Rosen, Charles I. Poret, New York City, on the brief), for claimant-appellant.

A. Edward Grashof, New York City (Winthrop, Stimson, Putnam & Roberts, Marie L. McCann, New York City, on the brief), for appellees.

Before FRIENDLY, FEINBERG and GURFEIN, Circuit Judges.

FEINBERG, Circuit Judge:

Abarta Corp., doing business as Press Publishing Co., appeals from a decision of the United States District Court for the Southern District of New York, Sylvester J. Ryan, J., disallowing Abarta's claim of $177,028 as an administration expense or, alternatively, as a general unsecured claim in a Chapter X proceeding for the reorganization of R. Hoe & Co., Inc., debtor.[1] The amount claimed represents the difference between the original contract price for a printing press ordered by Abarta from the debtor prior to the Chapter X proceeding and the increased price Abarta eventually

paid the debtor's trustee,[2] appellee before us, to obtain delivery of the press. We hold that, on the unusual facts of this case, Abarta's claim as a general unsecured creditor is valid. Accordingly, we reverse the order of the district court.

I

In November 1968, appellant was the publisher of a newspaper in Atlantic City, New Jersey, and Hoe was a manufacturer of rotary printing presses and other machinery. At that time, the parties contracted in writing for the manufacture and sale by Hoe of a printing press to Abarta for a price of $836,679.[3] The press was designed for Abarta's specific needs and contained features Abarta could not have obtained from other manufacturers. Delivery was anticipated during the following summer. The contract called for installment payments and by July 7, 1969, Abarta had paid Hoe over $595,000. On that date, Hoe filed a petition for reorganization under Chapter X of the Bankruptcy Act.

Shortly thereafter, the petition was approved by Judge Ryan and a trustee was appointed. As is frequently the case in Chapter X proceedings, the trustee was immediately confronted with a cash crisis; the debtor needed several million dollars to enable it to continue in operation. If the immediate crisis could be met, however, prospects for reorganization did not seem out of the question. To generate cash immediately, the trustee proposed that the debtor use its principal efforts to complete the manufacture and delivery of printing presses for those customers who agreed both to prepay balances still due under their contracts and also to pay additional amounts over the contract price.

Over 70 customers of the debtor, including Abarta, were affected by this proposal, on which hearings were held

1. The actual order appealed from was signed by Judge Harold R. Tyler, Jr., to whom the proceeding had been assigned after Judge Ryan's decision.

2. At the time, there was only one trustee of the debtor. Although there are now two trustees, we will use the singular for convenience.

3. There was a later, minor upward adjustment of the contract price.

that same month. Not unexpectedly, the hearings were well attended and spirited. Most of the creditors seemed willing to cooperate, apparently assuming that the alternative of liquidation might not be very satisfactory, particularly for those who had already paid substantial amounts on their contracts. The creditors were concerned with a number of aspects of the proposal. Considerable attention was given to the status of any sums to be prepaid on balances due or to be paid as premiums if the trustee thereafter could not complete and deliver the presses. Some creditors also suggested that, even if the machines were delivered under the new arrangement, the extra amount paid over the contract price be considered as a loan to the trustee, eventually to be repaid by him. Others, as will be seen below, were content to accept the status of general unsecured creditors for the amount of this premium.

On July 22, 1971, the judge signed an order[4] authorizing the debtor to work principally on the presses of nine customers scheduled for delivery before September 8, upon their prepayment of the balance due under their contracts with the debtor, and to deliver the presses upon payment of an additional ten per cent of the original contract price. Until delivery, any amounts prepaid were to be treated as administration expenses, secured by non-interest-bearing trustee's certificates. The order was silent on what the status of any premium would be after a press had been delivered, although, as will be seen below, this issue had been raised at the hearings. The order also authorized the trustee to negotiate with other customers whose orders had scheduled delivery times after September 8 "to determine the amount of prepayment and additional sum to be paid to the trustee."

Abarta was in this second group, and in the ensuing months the trustee negotiated with it as well as with others. The discussions culminated in an order on November 3, 1969,[5] which was similar to the earlier blanket order. Under this later order, the debtor would "devote its principal efforts" to work on Abarta's machine upon payment of $423,493, of which $342,787 would be protected by a trustee's certificate until delivery of the press.[6] It is stipulated by the parties that $177,028 of this sum represented "an increase . . . in the purchase price of the press."[7] The press was subsequently delivered, and Abarta filed its proof of claim for $177,028, relying on two theories. The first was that this sum was allowable as an administration claim, because

> [t]he payment of said premium over and above the contract price constitutes actual and necessary expenses of preserving the Estate of the Debtor subsequent to the filing of the petition herein.[8]

Abarta's alternative theory was that the $177,028 should be allowed as a general unsecured claim, because

> the payment of said premium constitutes damages to the claimant arising from what was in substance the rejection by the Trustee of an executory contract between the Debtor and the claimant.[9]

The trustee objected to the claim, arguing that Abarta had renegotiated its original contract with the debtor and no longer had any rights under it. Judge Ryan appointed United States Magistrate Harold J. Raby as special master to hear and report upon this claim, along with others. After a hearing, the special master reported in March 1971. The master first pointed out:

---

**4.** Order No. 5.

**5.** Order No. 29.

**6.** The record is not clear why the entire $423,493 was not so protected.

**7.** Stipulation of Historical Facts, ¶ 8.

**8.** Id. at ¶ 11.

**9.** Id.

The importance of this claim lies, not only in the intrinsically substantial amount of the claim itself, but also in the fact that this claim constitutes a "test case", upon the ultimate determination of which will depend the propriety of a number of substantial claims of similar nature.

The master recommended that Abarta's claim be allowed in full, but only as a general unsecured claim. The master rejected the trustee's argument that the later agreement eliminated any claim for breach of the original contract, concluding that:

> From the colloquy between counsel for the various claimants whose position was identical to that of this claimant . . ., it seems quite clear to me that, contrary to the position of the trustee, the claimants did not agree to relinquish their right to file a claim against the debtor for breach of its original contract.

The trustee thereafter moved before the district judge to reject that part of the master's report favorable to Abarta. In a memorandum decision, dated January 10, 1974, the judge accepted the trustee's contentions and disallowed the claim in full. The heart of the court's reasoning was as follows:

> At the date of the reorganization petition, claimant faced the loss of more than a half million dollars previously paid for a press that Debtor could not deliver; more important to [Abarta], it faced non-delivery of its much needed equipment, which it could not receive if the Trustee had no funds to complete the manufacture. Claimant was faced with a business decision: (1) either to pay no more and to assert an unsecured claim for the money it had paid on account to the Debtor; or (2) to agree with the Trustee to pay immediately the balance of the purchase price plus an additional negotiated amount to enable the Trustee to complete the press. [Abarta] chose the latter alternative. It cannot now have the benefit of its choice to acquire its press and, at the same time, assert a claim for the money it agreed to pay to enable the Trustee to manufacture it.

To support this result, the judge also referred to two statements made at one of the July 1969 hearings in the district court.

## II

On this appeal, Abarta argues principally that the refusal of the trustee to deliver the press ordered by Abarta at the original price was a breach of contract entitling Abarta to damages, which its later agreement to pay a premium for delivery, even if valid, did not eliminate. Abarta also contends that its rights under the original contract could not be destroyed by the later agreement because it was a product of "economic duress." Finally, Abarta argues that its claim for $177,028 should have been allowed as an expense of administration. In response, the trustee claims that as a matter of law he did not breach the debtor's contract with Abarta and that, even if he did, the later agreement, which was perfectly valid, extinguished any claim by Abarta, no matter how denominated.

■■ We find the case to be a troublesome one, but after a careful review of the record and the applicable law, we believe that Abarta's claim should have been allowed as a general unsecured claim, as the special master recommended. As Abarta points out, ordinarily an unjustified failure to perform all or any part of what is promised in a contract—here, delivery of the press at a specified price—is a breach for which the aggrieved party is entitled to compensatory damages. The law is also clear that a repudiation of a contract communicated from a seller to a buyer, prior to the time for delivery by the seller, is a breach which creates an immediate right of action. N.Y. Uniform Commercial Code § 2–610 and Official Comments thereto (McKinney's Consol.Laws, c. 38, 1964). But as the trustee correctly replies, a Chapter X proceeding is not an ordinary case. In this context, the trus-

tee argues, the prerequisites to a successful claim for breach of an executory contract are express rejection following a hearing on notice to the parties and permission of the court to reject. None of these elements, according to the trustee, is present here.

■ On the unusual facts of this case, we believe this last contention is erroneous. It is true that judicial action is necessary for rejection of an executory contract in a Chapter X proceeding, and that the formalities must ordinarily be complied with. Cf. In re American Nat'l Trust, 426 F.2d 1059, 1064 (7th Cir. 1970); Texas Importing Co. v. Banco Popular, 360 F.2d 582 (5th Cir. 1966); In re Childs Co., 64 F.Supp. 282 (S.D.N.Y. 1944). But the record of these proceedings discloses an in-court coalescence of repudiation by the trustee with approval by the court. The judge made clear that the choice of creditors whose presses had been ordered and paid for in part, but not yet delivered, was to pay more on

the original contract or to look to liquidation.[10] While the trustee occasionally said he was not rejecting the original contracts, the effect of what was happening was precisely that. The court obviously gave its blessing to the increases in contract price, and authorized the trustee to give priority to completing the work under the new arrangements.[11] We believe that this satisfied the requirements of sections 116 and 202 of the Bankruptcy Act that the court "permit" the rejection of an executory contract.[12] This conclusion is fortified by various colloquies in open court with respect to the status of the premium payments. The judge repeatedly stated that creditors like Abarta, who made such payments, would have the right to file claims for them as general unsecured creditors under their original contracts. Such a right could logically be pressed only on the theory that their original contracts had been breached by Hoe's refusal to perform at the original price.

**10.** For example, the judge told the attorney for a press customer, which had still not reached an agreement with the trustee on the premium to be paid for completion:

> [E]ither you are going to wind up in this case filing a claim as a creditor for non-delivery of the machine, or you are going to get a machine and a press that works.
>
> .  .  .  .  .
>
> You [must] have money in your hands and you [must] be willing to pay it. Otherwise, you can't get your machines.
>
> .  .  .  .  .
>
> Otherwise, you are going to be a creditor, rather than a purchaser. It is as simple as that.

Transcript of hearing, Oct. 8, 1969.

**11.** Thus, Order No. 5 stated that the trustee "is authorized to direct the Debtor to devote its principal efforts to the manufacture and delivery of presses" to those customers who had consented to prepay the balances due and to pay the 10% premium before delivery. Order No. 29 contains the same "principal efforts" language.

At one of the hearings, the judge told the customers whose machines were scheduled for delivery before September 8:

> If you do not want to consent [to Order No. 5] don't consent.  .  .  .
> Your machines will not be worked on [if you do not consent]. If they are worked

on they will not be delivered. You have such remedies as might be available to you in law.

Transcript of hearing, July 17, 1969.

A few minutes earlier he had said, in a similar vein:

> Now that in a nutshell is the story; either you want these machines or you don't want them.
>
> If you want the machines we have to have the money to complete them; we have to have the money to keep the plant going.
>
> .  .  .  .  .
>
> I do not intend that we make any profit on this but I don't know how we are going to work out and renegotiate these matters on these uncompleted machines  .  .  . other than the way we have enumerated that here.
>
> If your clients don't want these machines, don't take them, don't make the payment. It is as simple as that.

Id.

**12.** We do not understand the argument of the trustee that there was no hearing on notice to the parties. While Order No. 29, see note 5 supra, was entered on consent, Order No. 5, which approved the basic procedure after extensive hearings recites that notice was given to "press customers" and that "various  .  .  . interested parties  .  .  . participated and presented their views."

---

These comments by the court lead to the trustee's equally troublesome contention that the new arrangement operated as a "novation" or "substituted contract," which eliminated any rights under the original contract. According to this theory, Abarta has no valid claim because the later agreement was performed in full. There is no doubt that the relevant orders are silent on the status of any claim regarding the premium payments, once the machines were delivered. But the following analysis appears useful. Let us assume a situation in which a solvent seller tells a buyer that because of increased costs the seller will not be able to manufacture and deliver goods without an additional payment and that unless the buyer makes or agrees to make such a payment, the seller will stop work, knowing that he will be subject to a successful suit. If the buyer agrees in writing to pay the additional sum without any reservation of rights, then, in the absence of economic duress, the buyer surely cannot maintain a suit against the seller after delivery of the goods. N.Y. Uniform Commercial Code § 2–209 (McKinney 1964). If, on the other hand, the buyer agreed with the seller that he would make the payment but that upon delivery of the goods he would sue for its recovery, a solvent seller would generally decline to proceed.

The situation differs, however, when the seller is insolvent. In such a case, a trustee for the seller might well decide to go ahead in the face of a reservation of rights by the buyer because of the desirability of getting funds with which to keep the venture alive and because of his knowledge that in all probability the buyer would not realize 100 cents per dollar on his general unsecured claim for damages for breach of the original contract.

The question thus becomes whether the buyer here effectively reserved its right to damages for the premium paid to obtain delivery. We conclude that the purchasers, including Abarta, reserved their right not merely to place a piece of paper in the files of the district court but to have the claim embodied in it sustained (if it was otherwise valid), free from any contention that they had merely entered into substitute contracts. While some of the statements at the hearings were ambiguous,[13] a fair reading of the transcript as a whole persuades us that Abarta's rights were preserved.[14] The extracts cited by the judge in his memorandum opinion do

---

13. E. g., the following interchange occurred at the July 22, 1969, hearing:

> Mr. Wesely [counsel for the trustee]: To make it completely clear, your Honor, [at the time of delivery of the press] we would expect back the certificate issued for the prepayment of the balance due. . . .
>
> The Court: But even if you turn back that certificate, they would still have a claim, whether or not it would be sustained or not, as an administration claim, they would still have a general claim, whether or not it would be sustained or not, a general claim as to additional amounts to be paid to get the machine over and above the contract price. That is my understanding of the law.

14. When an attorney for several press customers said his clients would be willing to pay the 10% premium if it were treated as a loan to the trustee repayable by him, the judge replied:

> That was discussed and it cannot be received under that condition:

> No. 1, I want to point something out to you, that your creditors or your clients would have a claim against the estate as a general creditor for any additional amount they paid for their machines over and above the contract price.

Transcript of hearing, July 17, 1969.

Shortly thereafter, the judge re-emphasized the point in response to another attorney's question, and the following colloquy with counsel for the trustee ensued:

> The Court: No, I said that even though you had made this payment of an extra 10 per cent, that would not be considered as a waiver on the part of any purchaser of his right to claim this additional 10 per cent payment as an item of damage in the performance of the contract and file a claim in the event as he so selects as a general creditor for that amount.

> Mr. Wesely: . . . However, upon receipt of the press there would be no administration claim, no trustee obligation of any sort.

not support a contrary conclusion.[15] The opinion described Abarta's options in response to the trustee's proposal as, on the one hand, to pay no more and assert an unsecured claim for the money already paid to the debtor, or, on the other hand, to agree with the trustee to pay both the balance due and a premium to get the press. We believe that the description of the second option was too limited; it should also have included the right to recover part of the additional premium by filing a proof of claim in the proceeding. Abarta took the latter course only after press creditors were told "50 times," see note 14 supra, that their right to do so was preserved. Under the circumstances, it was improper to deny Abarta the substance of that right at a subsequent stage in the proceedings.

 While Judge Ryan is to be commended for his skillful handling of the reorganization proceeding at a particularly difficult time, we believe that the special master's recommendation should have been followed. Accordingly, we hold that it was error to disallow and expunge Abarta's claim as a general unsecured creditor. We agree with the

> The Court: Except that they would have a right to file and claim as a general creditor for alleged breach of contract.
> Id.

At the final hearing on Order No. 5 several days later, an attorney for a press customer suggested that an express reservation of his client's right to claim the additional amount as damages be included in the order so that there could be no conceivable question of waiver of those rights. Judge Ryan replied that while he did not see any objection to having such a provision in the order, "it might complicate things" and that "this order primarily is designed not to cover that but to cover completion and to cover the issuance of the trustee's certificate." Thus, the following colloquy then took place:

> The Court: Proof of claim of what?
> Mr. Gould: On the additional amount.
> The Court: You have that right. You want it in. If you want it in here I will put it in. But you have a right to file a claim for alleged brief [sic] of contract as a general creditor.

Judge Ryan expressly declared that there would be no waiver, in the following colloquy applicable to all press customers who chose to pay the additional premium:

special master and the judge, however, that the claim was not entitled to administration status.[16]

Case remanded with directions to allow Abarta's claim in accordance with this opinion.

> The Court: . . .
> . . . I say that as a matter of law if you don't waive your right, you have it and I have been careful not to have you waive your right.
> Mr. Gould: It is understood we are not waiving any rights.
> The Court: I said that 50 times. I say it again.
> Mr. Gould: We have it on the record. It is clear.
> The Court: It is on the record as far as I remember for our last three meetings.
> Mr. Gould: Fine. In those circumstances McClatchy will go along. . . .
> Transcript of hearing, July 22, 1969.

15. One was the remark by counsel for the trustee, quoted in note 14 supra, which was immediately modified by the judge to reserve the right at issue here. In any event, counsel's remark was clearly limited to the status of the payments as administration expenses and would not be controlling. The other extract was a remark of the judge, which can best be construed to the same effect.

16. On this disposition, it is unnecessary to deal with Abarta's argument alleging economic duress.